(Nos. 14147-14222.—Decree affirmed.)

GILMAN M. CLARK, Admr. *et al.* Appellants and Appellees, *vs.* A. GERTRUDE MERRILL *et al.* Appellees and Appellants.

*Opinion filed February 22, 1922—Rehearing denied April 6, 1922.*

1. APPEALS AND ERRORS—*when questions of mental capacity and undue influence need not be considered.* Whether one who has assigned all of his personal property to another was mentally competent and whether there was fraud and undue influence by the assignee are questions which need not be considered where the assignor died intestate, leaving as his only heir a bachelor brother, who, being of sound mind, at once executed to the assignee conveyances transferring to her all of the property, real and personal, which he inherited from the assignor, including the property covered by the assignment.

2. BANKS—*when bank is not liable for delivery of property according to owner's written order.* A bank is not liable for delivering the contents of a safety deposit box in accordance with a written order by the owner, signed when he was of unsound mind, where there is no evidence that the bank knew of the mental incompetency of the owner at the time he signed the order.

3. JUDGMENTS AND DECREES—*when decree may create lien to secure return of personal property.* A decree setting aside certain deeds and instruments and sustaining others conveying real and personal property to the defendant may create a lien upon the property conveyed to the defendant by the instruments held valid, in order to secure the return by the defendant to the complainants of personal property of which she had already taken possession under the invalid assignment.

APPEALS from the Circuit Court of Warren county; the Hon. R. J. GRIER, Judge, presiding.

QUINN & QUINN, O'HERN & O'HERN, and FRANK S. HALLAM, for Gilman M. Clark, Admr. *et al.* appellants and appellees.

A. K. HARDY, JOHN H. ARMSTRONG, and J. W. CLENDENIN, for A. Gertrude Merrill *et al.* appellees and appellants.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

James Blood died intestate May 7, 1917, leaving him surviving as his only heir-at-law a brother, Hiram Blood. The latter died intestate June 2, 1917, leaving as his only heirs-at-law nine first cousins, Gilman M. Clark, Theodore P. Clark, Ella Melick, Cornelia E. Buchanan, Amanda Olmstead, Frederick Townsend, Everett Merrill, John N. Merrill, complainants below and for convenience so designated here, and James Merrill, a defendant below. James Blood was seventy-six years of age at the time of his death and Hiram was eighty-four. They were bachelors and had lived all their lives in the southeast part of Warren county. At the time of his death James owned the quarter section of land on which he was living and Hiram owned a farm of 200 acres immediately adjoining. After the death of their parents these two brothers lived with a bachelor brother and a spinster sister until the death of their sister some forty years ago and of their brother some thirty years ago. Shortly after the death of their brother Hiram moved to a house on his farm about thirty-five rods from the house where James lived, and thereafter each lived alone. Both were highly respected citizens but were close in their dealings. Each accumulated considerable property,—James the 160 acres of land in Warren county worth about $125 an acre and about $85,000 worth of notes and other personal property, and Hiram the 200 acres of land in Warren county worth about $125 an acre, 200 acres of land in Iowa worth

about $80 an acre, a section of land in Texas worth about
$5000, and personal property worth about $25,000. This
litigation arises out of a number of transactions by which
the defendant Gertrude Merrill became possessed of all the
real and personal property of James and Hiram. She is a
daughter of the defendant James Merrill, who resided at
Champaign, Illinois. She was invited by Hiram to come
to his home in the summer of 1909. She was then about
twenty-six years of age. Prior to that time she had worked
as a clerk and book-keeper for seven or eight years at
Champaign. She remained at the home of Hiram most of
the time for the next four years, when she left and took
employment as a demonstrator of canned fruits and vege-
tables for the Jobst-Bethard Company, of Peoria. She was
injured in this employment in August, 1913, and for the
next two years she was at different places, recovering from
her injuries. Early in the summer of 1915 she went to the
home of James Blood and remained there most of the time
until his death. James was stricken with apoplexy in the
morning of May 2, 1917, and was unconscious for several
hours. The left side of his body was paralyzed. The par-
alysis was caused by a hemorrhage in the brain, and the
attending physician testified that death was caused by the
poisoning of the system due to the absorption of the blood
clot. During the afternoon and evening of May 3 James
transferred to Gertrude Merrill by endorsement of certain
notes and by the execution of an instrument by which he
purported to place in escrow certain other notes, securi-
ties aggregating more than $83,000. The so-called escrow
paper and the assignment on the back of the notes were
prepared by Reed Campbell, cashier of the defendant the
First National Bank of Abingdon. The transactions were
witnessed by the attending physician, Dr. Ernest Davis,
of Avon, and by A. C. Clore. Gertrude Merrill was pres-
ent and helped support James as he sat in his bed and af-
fixed his signature to the several writings. May 8, 1917,

the day following the death of James, Hiram executed, acknowledged and delivered a. quit-claim deed conveying to Gertrude Merrill the quarter section of land which Hiram had inherited the night before from his brother, James. Two days later Hiram executed and delivered the following writing:

"Whereas, on the 3d day of May, 1917, James Blood, now deceased, and brother of the undersigned, Hiram Blood, executed and delivered to said A. Gertrude Merrill an instrument in writing ordering and directing the First National Bank of Abingdon, Illinois, to place in escrow the following notes and securities or their equivalent, with directions that the same be given to said A. Gertrude Merrill upon the death of said James Blood, and which list of notes and securities is as follows: [Describing them.] And whereas, it is well known to the undersigned that said James Blood desired said A. Gertrude Merrill to have and to hold said securities as her absolute property in consideration for the many years of faithful service rendered to said James Blood:

"Now, therefore, in order to more fully carry out the wishes and intentions of said James Blood regarding the disposition of said securities, and for the consideration of one dollar ($1.00) in hand paid, the receipt of which is hereby acknowledged, and in consideration of the services also rendered to the undersigned by said A. Gertrude Merrill, I, Hiram Blood, hereby sell, assign, transfer and set over unto A. Gertrude Merrill all my right, title and interest of every kind and character, if any I have, in and to the above mentioned securities and each of them, and also all my right, title and interest of every kind and character in any other property of which the said James Blood died seized or possessed, and hereby authorize and direct the holder of said securities, or any other property owned by said James Blood at his death, to deliver over to said A. Gertrude Merrill.

"This instrument is not executed because the undersigned does not regard the instrument dated May 3, 1917, signed by James Blood and witnessed by A. C. Clore and Ernest E. Davis, sufficient to vest the title to securities therein mentioned in A. Gertrude Merrill, but this instrument is executed for the purpose of facilitating the settlement of the estate of James Blood and for the purpose of more fully securing to said A. Gertrude Merrill the title to the securities mentioned and to the property owned by said James Blood.

"Witness my hand and seal this 10th day of May, 1917.

HIRAM BLOOD. (Seal)

Witnesses: A. E. Rubart, Edwin Babbitt."

In the evening of May 28, 1917, Gertrude Merrill se-
cured from Hiram Blood three separate deeds conveying to
her absolutely all the real estate owned by him and certain
other assignments and orders giving to her all his personal
property. He died at midnight four days later. Gilman
M. Clark was subsequently appointed administrator of the
estate of James Blood, deceased, and of the estate of Hi-
ram Blood, deceased. December 28, 1917, the administra-
tor of the estate of James Blood, the administrator of the
estate of Hiram Blood, and the heirs-at-law of Hiram
Blood, filed their bill in the circuit court of Warren county
seeking to set aside all the instruments by which Gertrude
Merrill claims the property in question, on the ground that
James and Hiram were both without sufficient mental ca-
pacity to execute the instruments at the time they were
signed, and that the instruments are void for the reason
that they were secured by the fraud, misrepresentation and
undue influence of Gertrude Merrill. It is further charged
that the First National Bank of Abingdon was the agent
and depository of the personal property of James and Hi-
ram, and it is sought to compel it to account to the two
estates for the property delivered on the void instruments.
The cause was heard in open court by the chancellor, and
he found that the transactions of May 3, 8 and 10 were
valid and that the transactions of May 28 were void. He
directed that Gertrude Merrill account to the administrator
of Hiram Blood for the personal property transferred to
her on May 28 and to the heirs of Hiram for the real es-
tate conveyed to her on the same date, and ordered that
defendants have a lien upon the real and personal property
which she received by the instruments of May 3, 8 and 10
to guarantee the compliance of Gertrude Merrill with the
provisions of the decree in their favor. Complainants ap-
pealed from that part of the decree confirming in Gertrude
Merrill the property formerly owned by James Blood, and
defendants appealed from that part of the decree directing

Gertrude Merrill to turn over to the administrator and the heirs of Hiram Blood the property formerly owned by him. The appeals have been consolidated here for hearing and decision.

From the conclusion we have reached we think it best to consider first the transactions of May 8 and 10.

Guy Hardy, an attorney of Galesburg, prepared the deed dated May 8 and the writing dated May 10. He testified that Reed Campbell requested him to go to the home of Hiram Blood to prepare a deed for him; that when they arrived Campbell introduced Hardy to Blood, and Blood replied that Hardy was not the attorney that he knew by that name, and that the Hardy he knew had represented him in a lawsuit many years before; that Hardy told him that was his older brother; that Campbell told Blood that Hardy had come to prepare the deed he wanted prepared, and Blood said all right; that Hardy started to open an atlas which he had brought with him, and Blood said that he knew the description of his brother's land and that he would give it to him; that Hardy wrote down the description as Blood gave it to him and then compared it with the description on the map in the atlas; that Blood said he did not need to compare the description because he knew it, but Hardy replied that it was his practice at the office or elsewhere to verify all descriptions of land in deeds; that after the deed was prepared Blood read and signed it; that while Hardy was preparing the deed Gertrude Merrill came into the house and the deed was given to her; that Blood said he knew his brother would want done what he had done; that Blood then asked Hardy to prepare a paper confirming the transfers of personal property made by his brother, James; that Hardy told him that he preferred to prepare the paper at his office, and Blood said that would be all right, because he was not in any particular hurry; that Hardy prepared the instrument confirming in Gertrude Merrill the personal property of James Blood and conveying to her whatever

personal property James owned which had not been there-
tofore conveyed to her, and delivered it to the First Na-
tional Bank of Abingdon to be submitted to Hiram Blood
for his signature; that Hardy told Blood that he had in-
herited all the property owned by his brother, James, at
the time of his death; that Blood told him he wanted in-
struments prepared that would transfer to Gertrude Mer-
rill all the interest he had in any property of his brother;
that the clause to the effect that the instrument of May 10
was executed partly for the purpose of facilitating the set-
tlement of the estate of James Blood was inserted by Hardy
without the suggestion of Hiram; and that Hiram told
Hardy that he understood that his brother, James, had
transferred all his personal property to Gertrude Merrill.
Hardy was not asked and did not express an opinion as
to the mental competency of Hiram Blood.

Dr. George F. Hilton, of St. Augustine, who had known
Hiram Blood for more than thirty years, attended him
from August 2, 1916, until the time of his death. When
he began treating him he was suffering from a cancer of
the face. This cancer was removed, and with it most of
the flesh from one side of the face and part of the nose
and ear. Another cancer appeared under the opposite jaw
about December 28, 1916, and it continued to grow until
the swelling reached into the throat and affected the vocal
chords. Before he died there was a cancerous development
over his entire face. The cancer under the jaw gradually
increased in size until it broke on the morning of May 31
and caused his death shortly after midnight of June 1. Dr.
Hilton testified that Hiram could not talk after May 22;
that he tried to talk with Hiram while he was treating him
May 25 or 26 but that he could not reply; that he never
uttered a word after May 22 that he could understand; that
he saw him May 22, 24, 26, 27, 28, 29, 30, 31 and June 1;
that he dressed his face every day he was there; that from
his observation he was not able to tell whether Hiram could

see; that he sometimes showed some understanding of what
was going on by nodding his head; that a man called Pete
stayed with Hiram and nursed him during his last illness;
that there was no time after May 26 when he made any
complaint or spoke to him or indicated that he knew who
he was, nor did he indicate that he knew anybody was
around him, and that he was delirious part of the time
and kept moving the bedclothes. James Blood was buried
May 11 and Hiram remained at James' house a few days
after the funeral. Dr. Hilton testified to a conversation
between Gertrude Merrill and Hiram when she insisted on
his going back to his home. She told him that his face was
offensive and that it was distasteful to the company which
she was entertaining at the house. He did not want to go
and begged to stay. He told her he was doing all right
there and that he wanted to stay a few days more. He was
angry when she insisted on his going and said he supposed
he would have to go back because he had turned everything
there over to her. Dr. Hilton advised him to go home and
took him home in his automobile. It was the opinion of
Dr. Hilton that Hiram was conscious of what was going
on about him up until May 26. He was not asked and he
did not express an opinion as to the mental competency
of Hiram to transact business on any of the dates here
in controversy.

Dr. Davis was at the home of James Blood May 9 at-
tending one of James' relatives who had come to attend
the funeral, and Gertrude Merrill insisted that he go over
to Hiram Blood's home and see him. Dr. Davis protested
because he was not his attending physician, but she insisted
and he went with her. He found Hiram lying on his bed.
He spoke to him and asked him how he was getting along,
and he made reply to the query and then said he was glad
to see him. He spoke about his fire being low and started
to get up to fix it, but Pete told him to lie down and that
he would fix it. Dr. Davis testified that when he asked

Hiram a question his answer was clear and intelligent, and that as far as he was able to determine in that short visit Hiram was mentally clear.

P. H. Tanney, who lived about a mile and a half from Hiram Blood's home and who had known him for many years, testified that he saw Hiram at James Blood's funeral; that he shook hands with him and spoke to him; that a few days afterwards he was driving along the road and saw Hiram in his yard; that Hiram asked him to bring him some eggs and rhubarb, and he replied that he would; that he brought the eggs and the rhubarb a few days later; that Hiram asked him how much they were worth, and that he told him that he was not peddling produce and that he just brought them over to him; that Hiram replied that as a friend he would accept them; that he asked him to put the rhubarb in the cellar for him while he put the eggs away; that they sat down on some chairs in front of the cook stove and visited for some time; that Hiram asked him why he did not come up to see him when he telephoned for him, and he replied that he did not get the message; that Hiram said, "I sent for you; I gave all of James' property to Gertrude and I wanted you for a witness;" and that Hiram said further, "It is too damn much property for one woman to have, but James wanted it that way and I didn't want James' money." Tanney considered Hiram of sound mind at this time.

Mrs. Victoria Simmons, who lived about three-quarters of a mile south of the Blood farms, saw Hiram Blood at James Blood's funeral. He was sitting on a chair about six feet from her and he heard someone call her name. He spoke up and said, "There is Mrs. Simmons," and stood up to come to speak to her. She met him and asked how he was, and he replied that he was tolerable well and that he was not suffering any. She saw him again the Sunday following the funeral. She and her husband called at the James Blood home and saw Hiram sitting at the table eat-

ing his dinner. He passed the time of day with them and said he was not suffering any that day. He had soups and other soft foods and at that time was drawing them through a glass tube. She testified that he was badly stooped and walked feebly, but that she considered him of sound mind.

T. J. Simmons, who had known Hiram Blood nearly all his life, saw him the Sunday before James Blood died. He passed the time of day with him but nothing important occurred. He next saw him at James' funeral and saw him again the Sunday after the funeral. He expressed the opinion that he was of sound mind on all these occasions.

J. B. Wilson, whose first wife was a cousin of Hiram Blood, came to attend James' funeral. He called on Hiram on Friday morning, May 11, and they visited for a while. During the conversation Hiram asked Wilson what he thought of the disposition James had made of his personal property, and Wilson replied that he thought he had done all right with it. Nothing was said about what disposition had been made, each assuming that the other knew what was meant. It was Wilson's opinion that Hiram was of sound mind on that day.

A. E. Rubart, a farmer living three and a half miles from Hiram Blood, was at Hiram's home May 10. He found him lying on his bed. He told Rubart that he was feeling about as usual; that he was suffering some, and that he was lying down because he could rest easier in that position than he could sitting up. While he was there Edwin Babbitt and Reed Campbell came. Campbell took a paper from his pocket and began reading it to Hiram. The paper was one transferring notes and other property formerly owned by James Blood to Gertrude Merrill. He read all of the paper except the list of notes, which Hiram said it was not necessary to read because he had been over that. After Campbell had finished reading the paper Hiram walked across the room to a table, sat down and signed the paper without assistance. After he had signed the paper

the witness and Babbitt signed it as witnesses, and then Campbell picked it up and took it with him. Rubart asked Campbell if it would be necessary for the James Blood estate to go through administration, and Campbell said that the object of the paper was to avoid administration of the estate. This conversation took place within the hearing of Hiram. Four or five days before this occasion Babbitt and Rubart were at the home of Hiram, who was lying on his bed. They noticed that he was out of wood, and Babbitt asked him where to find the ax so that they could get him some wood. He told them where the ax was, and said that it was not in very good condition. They found the ax, cut the wood and then left. The first information that Rubart had that he would be called as a witness was when Gertrude Merrill told him on the morning of May 8 that he could expect to be called that afternoon to the home of Hiram to be used as a witness. She had suggested to Rubart before James died that they get Hiram to deed her James' farm, but Rubart told her that the deed would be worthless until after the death of James. He was not called in the afternoon of May 8 but was called May 10. It was his opinion that Hiram was of sound mind on the 10th day of May, when he signed the instrument witnessed by Rubart.

Maud Merrill, a sister-in-law of Gertrude Merrill, who resides at Moline, testified that she arrived at the James Blood home May 9; that she called on Hiram Blood the next day; that she took his dinner to him; that she found him lying on his bed; that he raised himself up and spoke to her and asked her how George (her husband) was getting along; that she next saw him at James' funeral; that she saw him come in and look at James' body; that she saw him eat his dinner and saw him pass the time of day with people as they arrived; that shortly after the funeral she heard a conversation between Gertrude and Hiram about some money belonging to Hiram which Gertrude was to deposit in the bank for him; that Gertrude suggested that

3C2—17

she ought to keep out about $10 for expenses and that he told her $4 was enough and that she should get it in quarters and halves; that she overheard a conversation between James Fogarty and Hiram on Sunday morning, May 13, about turning some cattle into Hiram's pasture; that they discussed the price and agreed to four and a half cents a head a day; that while Hiram stayed at the James Blood place Gertrude assisted him in changing the bandages on his face; that the lump on the side of his neck looked like a large cauliflower; that she had never seen a human being so diseased about the head and face as Hiram was, and that at times it was very offensive to sit near him; that his mouth was drawn to one side on account of the growth and that one of his eyes was pulled down in an unnatural way because of the contraction of the skin; that she returned home May 19. It was her opinion that Hiram was of sound mind from May 9 to May 19, 1917.

Charles J. Cushman, a farmer who had known Hiram Blood for fifteen years and who lived about half a mile from him, testified that Hiram had failed rapidly in the last years of his life and that he walked with his body about half straightened up. He described the cancerous condition of his face and how his head and face were kept in bandages. He saw Hiram at James' funeral, and he testified that when people spoke to him he paid no attention to them. In good health Hiram weighed about 135 pounds, but his diseased condition caused loss of weight until at his death he weighed about 90 pounds. About a week before Hiram's death the witness called on him and found him lying on his bed with his head and face in bandages, and found no one around the place but Pete. Hiram did not speak to him. The witness testified that he was just lying there on his bed; that he could not tell whether he was asleep or awake, and that Pete told him he was in bad condition. The witness was not asked and did not express an opinion as to the mental condition of Hiram.

Mrs. Julia Lincoln had lived within a mile of Hiram Blood for about thirty years but had known him only four years. She and her husband were at James Blood's house the morning after he had his stroke and then they went over to call on Hiram. They found him half lying and half sitting on a couch. She testified that his appearance and physical condition were indescribable. She spoke to him, saying, "How do you do, Mr. Blood? Do you know me?" and he replied, "Yes; it is Mrs. Lincoln." He then told her about going down to her house about six months before to advise with her husband about what he should do concerning someone who had shot through the door of his house. The growth on the side of his neck had to a certain extent affected his speech, and she testified that it was difficult to understand him unless one knew the subject of the conversation. She was not asked and did not express an opinion concerning Hiram's mental condition.

Bion Lincoln, who had lived all his life within a mile of Hiram Blood, testified that Hiram's condition during the month of May, 1917, was indescribable; that for two or three years he had become more and more stooped, so that during the month before his death he walked so that the upper half of his body was almost parallel with the ground; that he called on the Bloods frequently; that he was at Hiram's about three or four months before he died, and that at that time the cancer under his jaw was about the size of a goose egg and looked as though it was almost ready to burst open; that the cancer which he had had removed had left a bad scar on the side of his face and continued as a running sore; that the growth on the side of his neck affected his speech and made him talk as though his tongue was partly paralyzed; that he saw Hiram on May 3, when he and his wife went over to his house from James' house, and that they remained fifteen or twenty minutes. He related the conversation between Hiram and Mrs. Lincoln regarding the visit made to their home about six months be-

fore. Witness told him that his brother, James, was low, and Hiram said, "Yes, he is in bad shape, I guess." A few days later he saw Hiram at James' house. While they were there, those attending James wanted to change his bed, and witness helped pick him up and place him in a chair. Hiram wanted to help and said that he could not lift much, but he placed the chair so that witness could put James in it. He next saw Hiram at James' funeral. He shook hands with him. He testified that Hiram spoke his name, but that he mumbled so that he could scarcely understand him. He expressed the opinion that from May 3 to May 11 Hiram was not mentally capable of transacting ordinary business.

A. L. Wingate, who had known Hiram Blood for about twenty-five years, testified that he saw Hiram in the fall of 1915 and at that time he walked badly stooped. That was the last time he saw him until the day of James' funeral. He spoke to him, but Hiram did not answer,—only nodded his head. He testified that Hiram's face was bandaged so that only his eyes were visible, and that he looked very feeble and like a man who was suffering. Witness did not shake hands with him nor did he attempt to hold a conversation with him. He expressed the opinion that from his observation of Hiram on that day he thought that he did not have sufficient mental capacity to know or appreciate the terms of a transaction involving the sale or disposition of real estate, and that he did not have sufficient mental capacity to understand the force and effect of a paper ratifying a disposition by his brother of a large number of notes.

This was the important evidence considered by the chancellor with respect to the transactions of May 8 and 10. Other witnesses testified, but their evidence related principally to the physical condition of Hiram Blood. In so far as it was material it tended to support the conclusion of the chancellor. The chancellor has certified to this court the original deed signed by Hiram on May 8 and the original instrument assigning the personal property

formerly owned by James Blood and signed by Hiram on May 10. We have examined the signature of Hiram to these instruments, and the signature is one written by a reasonably steady hand and compares favorably with the signatures admitted to have been written by Hiram in 1915 and 1916 and early in 1917. The evidence shows that Hiram was in serious physical condition during the entire month of May, 1917, but the evidence shows just as conclusively that his mental condition was not seriously affected prior to the middle of that month. Bion Lincoln is the only witness who had an opportunity to form a reasonable opinion regarding Hiram's mental competency, who expresses the opinion that he was mentally incompetent during the first half of May. On the other hand, at least five witnesses who had an equal opportunity to judge the mental condition of Hiram during this same period expressed the opinion that he was mentally competent to transact business of importance. There is no evidence whatever that the instruments executed by Hiram on May 8 and 10 were the result of the fraud, misrepresentation or undue influence of Gertrude Merrill or any other person. It is interesting to note in connection with the disposition of James Blood's property that there is not a word of testimony in the record showing that any of complainants ever visited at the home of James or Hiram or ever gave them any attention or that any of them attended James' funeral. If it is necessary to supply a reason for the desire expressed by James that his property should go to Gertrude Merrill, the fact that she and her family are the only ones of his relatives who gave him any attention supplies the reason. The chancellor properly found that these instruments were valid and properly confirmed title to all the real and personal property formerly owned by James Blood in Gertrude Merrill.

As we have said, the chancellor found that James Blood was mentally competent to transact business May 3, 1917, and that the orders and assignments signed by him on that

day were not obtained by the fraud, misrepresentation or undue influence of any person and that they were valid instruments of conveyance. Many witnesses testified on both sides of this controverted question, but it would extend this opinion to unnecessary length to discuss their testimony and no good purpose could be served by it. We think it proper to say that we agree with the conclusion reached by the chancellor, but having concluded that the instruments executed by Hiram Blood on May 8 and 10 disposed of all the property, real and personal, formerly owned by James Blood, there remains no reason for discussing the disposition of a part of this property by James, because by the instruments executed by James and Hiram the same property goes to the same person. Our conclusion also disposes of the questions raised regarding the competency of the witnesses Reed Campbell, A. C. Clore and C. E. Weir, all of whom testified in favor of the mental competency of James and Hiram. Having held that there is sufficient testimony, without considering their testimony, to hold the acts of Hiram valid, no useful purpose could be served by extending this opinion to discuss this legal question.

We now come to a consideration of the deeds and other instruments signed by Hiram Blood on the night of May 28,—four days before his death. We have set out in an earlier paragraph the testimony of Dr. Hilton with respect to the physical and mental condition of Hiram from May 22 to the time of his death. It might be well to add that about May 25 Gertrude Merrill suggested to Dr. Hilton that she wanted to make him a present of a Buick automobile which would cost about $1100. She did not tell him why she wanted to make him this present nor did he ask her. He says that about May 30 he said to her in a joking way, "When am I going to get that Buick automobile?" and she replied, "You are not going to get it; it is too late now." She did not explain to him what she meant by the expression, "It is too late now," but probably the

transactions of May 28 furnish the explanation. It may also be well to add that when Gertrude Merrill purchased the casket for James Blood she purchased one for Hiram.

E. H. Overholt, of Hollywood, California, testified by deposition that he was formerly in business in Galesburg; that Miss Merrill came to his place of business in Galesburg on May 28, 1917, and wanted his advice concerning a transfer to her of Hiram Blood's property; that she took him and Anna O'Hern and attorney M. J. Daugherty in the Packard automobile she had bought since James' death down to Hiram's farm, arriving there about seven o'clock in the evening. She and Daugherty went into the house where Hiram was, for the purpose of preparing deeds to his property. After they had been in the house for some time, Overholt and Mrs. O'Hern were called into the room. Hiram told Gertrude Merrill where she would find the abstracts and deeds and where she would find the key to the box in which he kept them. Overholt carried a lamp upstairs for her and she secured the papers and took them down to Daugherty. Overholt testified that after the deeds were prepared Hiram sat up on the edge of the bed and signed the deeds; that Gertrude Merrill said to him, "Aren't you giving me too much, cousin Hiram? Don't you want some other of your relatives to have some?" and that he replied, "No; I want you to have it all;" that Hiram spoke in a high, strong voice, and that he signed the instruments without any assistance and that his hand was not guided by anyone; that Overholt signed all the instruments as a witness; that he was there more than an hour and during that time he had no conversation with Hiram; that Hiram was lying on his bed while the deeds were being prepared; that his face and head were wrapped in bandages; that Gertrude Merrill's father, James Merrill, was in the room; that he noticed particularly that Hiram's voice was strong that night and that he talked in a rather high key and talked loud; that Gertrude Merrill sat beside him on the bed while

he was signing the deeds, but that he does not know whether she had her arms around him or whether she assisted him in sitting up on the edge of the bed; that he does remember that she pushed his feet back into bed after the deeds were signed; that Hiram did not know Overholt and did not speak to or recognize Mrs. O'Hern; that after Hiram had signed the deeds he lay back in bed; that that is the last he had to do with the papers, and that he was in bed when the witnesses signed the deeds and that he gave no directions as to what to do with them.

Mrs. Anna O'Hern testified that she had known Gertrude Merrill eight or nine years and that she went with her to Hiram Blood's home on the evening of May 28, 1917; that attorney Daugherty and Gertrude Merrill went into the house together and that she and Overholt were called in about twenty minutes later; that she saw Hiram sign several papers that night and she witnessed them; that when Hiram's signature was placed on the instruments Gertrude Merrill was sitting on one side of him and someone else on the other side; that she did not hear Gertrude Merrill ask him if he wasn't giving her too much and if he didn't want to give something to some other of his relatives; that she did not hear him reply that he wanted her to have all of it, and that she was where she could have heard such a conversation if it had taken place. Complainants sought to show by this witness that Gertrude Merrill guided the hand of Hiram as he signed each of the documents executed on the night of May 28, but the court refused to admit the evidence, partly on the ground that the bill did not charge that the signature to the instrument was not the genuine signature of Hiram nor that the instruments had not been properly signed or delivered, and partly on the ground that the evidence had not been offered in chief but was offered in rebuttal of the testimony of Overholt, and that it was not proper rebuttal.

P. H. Tanney, who testified that Hiram Blood was of sound mind up to the 15th day of May, 1917, testified that he saw him several days after that, and that he asked him how he was but that he could not understand him when he attempted to reply; that he seemed to know him and pointed to a chair, but that when Hiram undertook to talk witness could not understand anything that he attempted to say. He did not attempt to express an opinion of the mental competency of Hiram on this occasion but testified that he would certainly have some doubt about the soundness of his mind when he was unable to talk.

Clarence F. Wise, a farmer residing near Hiram Blood, who had known him for about twenty years and had rented pasture from him for about four years and was in Hiram's house every week or two during the pasture season, testified that he saw Gertrude Merrill around Hiram's place on two occasions, only; that he called to see Hiram about the last of April, 1917, and that Gertrude Merrill was there; that Hiram hitched up a horse for her and that she drove away; that at that time he was physically able to be around and to hold an intelligent conversation regarding pasturing stock; that he saw Hiram on Sunday, May 27, between nine and ten o'clock in the morning; that he went to look after his cattle which were on pasture and stopped at the house to see Hiram; that he walked up to him and said, "Good morning, Mr. Blood;" that he was lying on his bed and breathing very hard and slowly; that Pete was the only person there with him; that Hiram did not answer him, and he said, "Pete, Mr. Blood is dying, isn't he?" and Pete said, "No, but I thought he was;" that Pete went over to him and shook him and hollered at him, saying, "Mr. Blood, here is a man to see you;" that Hiram groaned a little but made no response; that witness told Pete to let him alone and that he was in no shape to be bothered; that he had seen Hiram two weeks before, and that at that time he could talk but it was difficult to understand what he said.

Thomas J. Sailer, who was renting pasture from Hiram Blood, testified that he saw him Sunday, May 20, about four or five o'clock in the evening; that he was lying on his bed and was asleep or unconscious; that he found Pete there; that while he was there Gertrude Merrill came; that she tried to rouse Hiram and told him that Sailer was there to see him; that he raised up his hand and made a sort of noise but witness could not understand anything he said; that Gertrude Merrill tried to talk to him and tried to rouse him, but he only made unintelligible mutterings and did not get up and did not recognize him; that some time before this he had had a conversation with Gertrude Merrill in which she had requested him to ask George L. Hagan to come to Hiram's home and make out some deeds for her; that he saw Hagan, who told him he was too busy to go; that she saw him again and urged him to have Hagan come out; that he saw Hagan again about the matter but the latter refused to go; that his best recollection is that she made the first request about May 17 and the second request about May 25.

Pearl Yeoman, who lived about a quarter of a mile from Hiram Blood and who had known him for four or five years, was at his house four or five days before he died. He was lying in bed with his eyes rolled back. He was delirious and did not seem to know anyone. Pete spoke to him several times, but Hiram only raised his hand and gurgled. He seemed to be unable to talk, and there was nothing said or done by him to indicate that he knew anybody or anything that was going on about him. Yeoman was of the opinion that at that time Hiram was not in condition to write his name.

Walter Morgan, who was employed as a chauffeur in May, 1917, drove Ed Blood, a relative of Hiram Blood, out to Hiram's farm Sunday, May 20. He was in Hiram's house about half an hour. He saw him lying on his bed with his head and face in bandages. He spoke to Hiram,

but he did not notice and did not say anything to him. During the time he stayed there Hiram did not talk to anybody and paid no attention to what was going on around him. He was not asleep, because his eyes were open, but he was just lying in bed.

Newell Lewis, a young man eighteen years of age in 1917, was employed by Gertrude Merrill as a chauffeur. The day following James Blood's funeral the demonstrator for the Packard automobile company showed her a car and after the demonstration she went to Chicago with him and purchased a car. She drove with it through Champaign back to the Blood farm. She employed witness as a chauffeur May 18, and from that day until Hiram Blood's death she drove every day to Monmouth or Galesburg or Peoria or some other place. Witness was driving her car the night of May 28, when she took the attorney and the witnesses from Galesburg to Hiram's farm. When she got out of the car she said to him, "Newell, you are not supposed to know anything going on around here; you keep your eyes shut." After Mrs. O'Hern and Overholt were called into the house by Gertrude Merrill witness stepped to the foot of the steps and saw Hiram lifted on the bed; that he was lying in bed and that he was lifted up by Gertrude Merrill and Pete. A table was brought over and set in front of Hiram and he fell limply across the table. He was weak and could not sit up straight. His arms hung limply at his side and his head was bent over toward the table. He saw one arm of Gertrude Merrill around him and her other arm upon the table. He saw a paper on the table. The other people then gathered around the table so that he could not see what else took place. Somebody started back across the room and he got back into the car. He and Pete and Gertrude Merrill and some lady from Abingdon had sat up with Hiram all night the night before. So far as he could see, Hiram lay in bed helpless, with his mouth open, in a semi-conscious state. He was in that condition all night.

Hiram tried to talk, but he was unable to understand anything he attempted to say. He had seen him on the 24th, 25th, 26th, 27th and 28th of May and was unable to understand anything he attempted to say during all that time. He was on duty all day and most every night. Gertrude Merrill had him driving her from one place to another during the day, and after returning in the evening many times would make another trip during the night. He saw Hiram early in the morning of the 29th of May. He took Gertrude Merrill from there to the First National Bank of Abingdon, and saw her receive from Orin Latimer, president of the bank, some notes and a bag of gold money belonging to Hiram. Latimer carried the property from the bank in a market basket and set the basket in the automobile. Gertrude Merrill showed witness what was in it, calling his attention to the bag of gold, and warned him that if anyone knew what they had they might try to rob them. He drove from there to a bank in Galesburg.

The above testimony is the principal evidence considered by the chancellor in determining that the deeds and other writings purporting to have been executed and delivered by Hiram Blood on the night of May 28 were void because of the mental incompetency of Hiram and because of fraud practiced by Gertrude Merrill. We have before us the original documents claimed to have been signed by Hiram on the night of May 28, and we have examined the signature and have compared it with other signatures in the record for the purpose of securing from the comparison what light we could get on the physical and mental condition of Hiram at the time he affixed his signature to these instruments. The signatures are unnatural and do not compare favorably with the signatures on the instruments executed May 8 and 10. There are three witnesses whose testimony the chancellor excluded on the ground that they were interested in the event of the suit, and it is contended by defendants that these witnesses were

competent. The witnesses Fogarty and Clark did not see Hiram after May 21, and they express no opinion as to his mental competency at that time. The witness Babbitt testified that he saw him on Sunday, May 27, and that he thought at that time he was of sound mind. The evidence is so overwhelmingly against the mental competency of Hiram on the evening of May 28 that the testimony of these witnesses, if competent, could not possibly have changed the conclusion of the chancellor. Overholt is the only witness who pretends to testify that Hiram was physically and mentally strong on the night of May 28. Every other witness who testified contradicted this conclusion, and from all the evidence in the record it must be clear to anyone that Overholt's testimony is not reliable. We have read all the testimony in this voluminous record, and the evidence is so strong that Hiram was physically and mentally incompetent to transact business after May 25 that it might reasonably be said that all the reliable testimony is to that effect and that it is practically uncontradicted. Daugherty died before the evidence was taken in this cause and we do not have the benefit of his testimony.

There is no evidence in the record that the First National Bank of Abingdon knew of the mental incompetency of Hiram Blood when he signed the order on the evening of May 28 directing Latimer to deliver the contents of Hiram's safety deposit box to Gertrude Merrill, and the chancellor properly held that the bank was not liable for the property delivered in accordance with the directions of the order. The decree properly protects complainants by creating a lien against the property belonging to Gertrude Merrill guaranteeing the return of the personal property belonging to the estate of Hiram Blood to its administrator.

The decree of the circuit court is affirmed.

*Decree affirmed.*